REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL

GOODWIN PROCTER LLP
I. Neel Chatterjee (SBN 173985)
nchatterjee@goodwinlaw.com
601 Marshall Street
Redwood City, California  94063
Telephone:  (650) 752-3100
Facsimile:  (650) 853-1038

GOODWIN PROCTER LLP
Darryl M. Woo (SBN 100513)
dwoo@goodwinlaw.com
Three Embarcadero Center
San Francisco, California  94111
Telephone:  (415) 733-6000
Facsimile:  (415) 677-9041

ADDITIONAL COUNSEL LISTED ON
SIGNATURE PAGE

Attorneys for Plaintiff
JBF Interlude 2009 Ltd. – Israel

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| JBF INTERLUDE 2009 LTD – ISRAEL,<br><br>          Plaintiff,<br><br>    v.<br><br>QUIBI HOLDINGS LLC,<br><br>          Defendant. | Case No. 2:20-cv-2299-JAK(SKx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge:      Hon. John A. Kronstadt<br>Courtroom:  7C<br><br>Filed/Concurrently Lodged With:<br>1. Notice of Motion;<br>2. Declaration of Yoni Bloch;<br>3. Declaration of Ivy Sheibar;<br>4. Declaration of Tal Zubalsky;<br>5. Declaration of Sandeep Chatterjee;<br>6. Declaration of Richard Eichmann;<br>7. Declaration of Neel Chatterjee; and<br>8. [Proposed] Order |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   BACKGROUND ................................................................................. 2

   A.   The Parties and Key Players ................................................. 3

   B.   Eko's Trade Secrets ............................................................. 5

   C.   Eko's Discussions with Snapchat, Inc. ................................ 7

   D.   Quibi Learns of Eko's Technology .................................... 11

   E.   Quibi Steals Eko's Technology and Claims It as Its Own ... 13

   F.   Quibi Causes Eko to Suffer Irreparable Harm .................... 14

   G.   Quibi Refuses to Honor its Confidentiality Obligations .... 15

III.  LEGAL STANDARD ........................................................................ 15

IV.   ARGUMENT .................................................................................. 16

   A.   Eko Is Likely to Succeed on the Merits of its Trade Secret
        Misappropriation Claim. .................................................... 17

   B.   Eko Is Suffering, and Will Continue to Suffer, Irreparable Harm. .... 20

   C.   The Balance of Equities Weighs in Eko's Favor. ............... 23

   D.   A Preliminary Injunction Serves the Public Interest. ......... 24

   E.   Only a Minimum Bond Should be Required. ...................... 25

V.    CONCLUSION ................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ................................................................ 16

*Alta Devices, Inc. v. LG Elecs., Inc.*,
  343 F. Supp. 3d 868 (N.D. Cal. 2018) .................................................... 18

*Am. Trucking Ass'ns, Inc. v. City of L.A.*,
  559 F.3d 1046 (9th Cir. 2009) ................................................................ 15

*Bal Seal Eng'g, Inc. v. Nelson Prods., Inc.*,
  Case No. 13-cv-01880-JLS-KESx, 2018 WL 4697255 (C.D. Cal.
  Aug. 3, 2018) .......................................................................................... 18

*Chalk v. U.S. Dist. Court*,
  840 F.2d 701 (9th Cir. 1988) .................................................................. 16

*Chartwell Staffing Serv., Inc. v. Atl. Sols. Grp., Inc.*,
  Case No. 19-cv-00642-JLS-JDE, 2019 WL 2177262 (C.D. Cal.
  May 20, 2019) ......................................................................................... 19

*Dep't of Parks & Recreation for the State of Cal. v. Bazaar Del Mundo
  Inc.*,
  448 F.3d 1118 (9th Cir. 2006) ................................................................ 16

*Diaz v. Brewer*,
  656 F.3d 1008 (9th Cir. 2011) ................................................................ 25

*Dish Network L.L.C. v. Ramirez*,
  No. 15-CV-04712-BLF, 2016 WL 3092184 (N.D. Cal. June 2,
  2016) ....................................................................................................... 24

*Droeger v. Welsh Sporting Goods Corp.*,
  541 F.2d 790 (9th Cir. 1976) ............................................................ 18, 19

*Friedman v. Quest Int'l Fragrances Co.*,
  58 F. App'x 359 (9th Cir. 2003) ............................................................. 18

*Hill Phoenix, Inc. v. Classic Refrigeration Socal, Inc.*,
No. 19-cv-00695-DOC-JDE, 2020 WL 1244354 (C.D. Cal. Mar.
15, 2020) .................................................................................................. 17

*League of Wilderness Defenders/Blue Mountains Biodiversity Project
v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) ................................................................. 23

*Quibi Holdings, LLC v. Interlude US, Inc. d/b/a Eko*,
Case No. 2:20-cv-02250 (C.D. Cal. Mar. 9, 2020) ............................... 15

*Stanley v. Columbia Broadcasting Sys.*,
35 Cal. 2d 653 (1950) ............................................................................ 19

*Teich v. Gen. Mills, Inc.*,
170. Cal. App. 791 (1959) ...................................................................... 18

*Waymo LLC v. Uber Techs., Inc.*,
No. C 17-00939 WHA, 2017 WL 2123560 (N.D. Cal. May 15,
2017) ...................................................................................................... 24

*WeRide Corp. v. Kun Huang*,
379 F. Supp. 3d 834 (N.D. Cal. 2019) ................................................... 24

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..................................................... 15, 20, 23, 24

**Statutes**

18 U.S.C. § 1836(b)(3)(B)(i) ......................................................................... 16

18 U.S.C. § 1839(5)(A)-(B) ........................................................................... 18

18 U.S.C. § 1839(6)(A)-(B) ........................................................................... 18

**Other Authorities**

Fed. R. Civ. P. 65(c) ..................................................................................... 25

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR PRELIMINARY INJUNCTION

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.  INTRODUCTION

Plaintiff JBF Interlude 2009 Ltd. – Israel ("Eko") seeks a preliminary injunction enjoining Defendant Quibi Holdings LLC ("Quibi") from misappropriating Eko's proprietary technology for mobile device optimized "Real Time Switching" ("mobile device optimized RTS").  This trade secret technology, which is a critical part of Eko's technology platform, had been shared with Quibi employees under multiple non-disclosure agreements ("NDAs").  In fact, when Quibi showed Eko a simulation that appeared to use Eko's technology, Eko warned the Quibi employees that Eko's technology platform, including its mobile device optimized RTS technology, was proprietary to Eko and could not be used without Eko's authorization.

Quibi ignored Eko's warnings and Quibi secretly misappropriated Eko's proprietary technology.  Ithid its theft until making a massive public splash in a keynote address at the January 2020 Consumer Electronics Show ("CES"), proclaiming it as Quibi's own "Turnstyle" technology.  In reality, Eko owns the technology and promptly asked Quibi to cease and desist.  In response, Quibi sent an untruthful letter and then filed a declaratory judgment action.  When the coronavirus pandemic hit, Quibi exploited the "stay-at-home" orders as a marketing tool to encourage people to sign up for its Turnstyle platform based on the misappropriated Eko technology.

Quibi, having raised $2 billion, and under enormous pressure to deliver on the media hype it generated, was desperate to find a way to deliver content.  Not having the technology to do so, it misappropriated Eko's trade secrets, claiming them as its own.  Quibi's actions have had a devastating effect on Eko's goodwill in the marketplace, causing it significant harm which cannot be quantified.  Previously viewed as having ground-breaking, unique and proprietary technology, Eko has suffered reputational harm, and now needs to explain its ownership of technology

that Quibi took from it.  Quibi appears to believe that because of its star power and its efforts to attract Hollywood talent, it is above the law.

This motion seeks to stop Quibi from capitalizing on its theft of Eko's proprietary mobile device optimized RTS technology and to preserve the status quo.[1]

## II.   <u>BACKGROUND</u>

This case concerns Eko's attempts to market its novel and proprietary mobile device optimized RTS technology, only to have it misappropriated by the same entity that reached out to Eko to explore a potential partnership.  Two sets of business discussions are relevant here.  The first set of business discussions were between Eko and Snapchat, Inc. ("Snap").  Snap, ultimately, was not interested in licensing Eko's technology, as it believed its users were more interested in viewing videos in "vertical" mode.  The discussions with Snap ended in May or June 2018, but not before Eko disclosed, under NDA, its proprietary technology to Snap employees, including CJ Smith, Joseph Burfitt and David Szeto.

The second set of discussions took place between Eko and Quibi.  In March 2017, Eko presented its mobile device optimized RTS technology and patented technologies to Jeffery Katzenberg, Quibi's founder.  However, the negotiations ceased because Mr. Katzenberg wanted, and Eko was unwilling to give up, a majority ownership stake in Eko.  Thereafter, a number of Snap employees who had been taught Eko's technologies in collaborative workshops while employed at Snap, including Messrs. Smith, Burfitt and Szeto,  left Snap for Quibi.

To Eko's surprise, Quibi announced Eko's mobile device optimized RTS technology as its own at the January 2020 Consumer Electronics Show ("CES"), calling it "Turnstyle."  To make matters worse, Eko and Quibi had been in discussions—on Quibi's initiative—about forming a partnership up until *the day*

---

[1] Eko is mindful of the fact that it is seeking relief during a challenging time.  But given Quibi's promotion of its product during this health crisis and refusal to wait until the time has passed, Eko is left with no other option but to seek judicial intervention.

*before* Quibi's CES presentation about Eko's mobile device optimized RTS technology. Not once did Quibi inform—and in fact it refused to tell—Eko about the subject of its CES presentation.

And, as explained in detail below, the similarities between Eko's mobile device optimized RTS and Quibi's Turnstyle technology are uncanny. Not only did Quibi highlight the same features of its Turnstyle technology that are also key to Eko's mobile device optimized RTS, but Quibi's patent also contains nearly identical language to Eko's earlier-issued patent directed to the same technology.

### A. The Parties and Key Players

#### 1. Eko

Eko is a small, investor-funded innovative media and technology startup company founded in 2010. Declaration of Yoni Bloch ("Bloch Decl.") ¶ 27. Eko is a groundbreaking technology company that provides "interactive storytelling" through video streaming, especially for mobile applications. *Id.* ¶¶ 5, 8. Among other things, Eko builds new platforms and a new medium for new creative authors. Declaration of Tal Zubalsky ("Zubalsky Decl.") ¶ 5. Eko's technology is protected by patents and as trade secrets. Bloch Decl. ¶ 9.

Eko has invested heavily in protection of its intellectual property. It owns a number of patents, one of which is at issue in this case. Bloch Decl. ¶ 9. Eko also aggressively protects its confidential information, and has taken reasonable measures to safeguard the confidentiality of its mobile device optimized RTS technology. *Id.* ¶ 10; Zubalsky Decl. ¶ 11. Eko stores its source code on password-protected servers and discloses it only on a need-to-know basis or under the protection of an NDA. *Id.* (both). Eko requires all employees and third parties with access to Eko's proprietary information to execute NDAs before being granted access to the source code. Bloch Decl. ¶ 10. Eko also trains its employees not to use or disclose confidential, commercially valuable information. *Id.*

Below is a description of several of the key Eko employees involved in the facts related to this matter.

**Yoni Bloch.**   Mr. Bloch is Eko's Co-Founder and Chief Executive Officer. Mr. Bloch is a well-known musician in Israel and is also a computer programmer. Since before the founding of Eko, Mr. Bloch has been fascinated with the concept of "interactive storytelling," which allows users participate in the story and can affect the experience of the story through electronic activity, such as pushing a button or choosing a storyline.   At Eko, Mr. Bloch is involved in technology development, discussions with investors, and  business development.   Mr. Bloch initiated and participated in the confidential discussions with Snap that eventually led to the theft of Eko's trade secrets.

**Tal Zubalsky.**   Mr. Zubalsky is Eko's Co-Founder and Chief Product Officer. He was instrumental in developing the trade secrets and shared the mobile device optimized RTS with the Quibi employees under the terms of an NDA.

**Alon Benari.**   Mr. Benari is Eko's Chief Creative Officer who developed the trade secrets at issue here.   Mr. Benari also led creative workshops with the Quibi employees and explained how the trade secrets functioned.

**Ivy Sheibar.**   Ms. Sheibar is Eko's Chief Business Officer who led the business development and licensing efforts with Snap and Quibi.

### 2.    Quibi

Quibi describes itself as a provider of "fresh content from today's top talent— one quick bite at a time." [2]   Quibi heavily promotes that its technology is designed for mobile devices and differentiates its technology through the promotion of the "Turnstyle" feature.   Quibi is scheduled to launch its service, including its stolen "Turnstyle" technology, in April 2020.   Below are some of the key people at Quibi related to this matter.[3]

---

[2] https://quibi.com/our-story/

[3] For convenience, the employees who left Snap and joined Quibi will be referred to as the "Quibi employees."

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR PRELIMINARY INJUNCTION

***Jeffrey Katzenberg.*** Mr. Katzenberg describes himself as "a leader of American media for more than 40 years." Decl. of N. Chatterjee ("N. Chatterjee Decl.") ¶ 2 & Ex. 1 at 1. Mr. Katzenberg is the former President of Paramount Pictures, former Chairman of The Walt Disney Studios,[4] former Co-Founder and Chairman of DreamWorks SKG, and former Co-Founder and CEO of DreamWorks Animation. N. Chatterjee Decl., Ex. 1 at 1-2. Currently, Mr. Katzenberg is the Managing Partner of WCI One, LLC ("WCI"), which he founded on October 18, 2017 as a Delaware limited liability corporation. N. Chatterjee Decl., Ex. 1 at 1; *id.*, Ex. 2. WCI later changed its name to "Quibi Holdings, LLC." *Id.*, Ex. 3.

***Clifton "CJ" Smith and Joseph Burfitt.*** Messrs. Smith and Burfitt are employees at Quibi. Both individuals previously worked at Snap, where they were provided access to Eko's proprietary and confidential technology pursuant to multiple NDAs while they worked at Snap and Quibi. Messrs. Smith and Burfitt signed NDAs with Eko again when they joined Quibi.

***Daniel Szeto.*** Mr. Szeto was the Head of Post Production and Content Innovation, and Eko's main tech integration contact, at Snap. In April 2019, Mr. Szeto left Snap and joined Quibi.

**B.    Eko's Trade Secrets**

One of the technologies developed by Eko is near-instantaneous switching between videos in landscape and portrait modes of a smartphone, called "mobile device optimized real time switching" ("mobile device optimized RTS").[5] The seeds of Eko's trade secret were planted in February 2012, when Alon Benari conceived the idea for ██████████████████████████████████████████.

---

[4] Paul Farhi, *Jeffrey Katzenberg Is Out At Disney*, The Washington Post, Aug. 25, 1994, https://www.washingtonpost.com/archive/lifestyle/1994/08/25/jeffrey-katzenberg-is-out-at-disney/b23fb461-71d6-490e-b4b5-1585a51676a1/.

[5] Landscape mode is when a device is horizontally positioned, whereas the device is in portrait mode when it is positioned vertically. Zubalsky Decl. ¶ 12; Bloch Decl. ¶ 14.

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR PRELIMINARY INJUNCTION

1   Zubalsky Decl. ¶ 8. ████████████████████████████████████

2   ███████████████████████████████████████████████████

3   ████████████████   Declaration of Sandeep Chatterjee ("S. Chatterjee Decl.")

4   ¶ 17; Zubalsky Decl. ¶ 10. ██████████████████████████████

5   ███████████████████████████████████████████████████

6   █████████████████████████████. Zubalsky Decl. ¶ 8. ████████

7   ███████████████████████████████████████████████████

8   ███████████████████████████████████████████████████

9   ████████████████████████████."'"   S. Chatterjee Decl. ¶ 18

10  (emphasis in the original). ████████████████████████████

11  ███████████████████████████████████████████████████

12  ██████████   *Id.*

      To prove that Mr. Benari's method could work, Mr. Zubalsky developed a

13

14  proof of concept video file██████████████████████████████████

15  █████████████████   Zubalsky Decl. ¶ 9. ██████████████████

16  ███████████████████████████████████████████████████

17  █████████████████████████████   *Id.*   █████████████████

18  ███████████████████████████████████████████████████

19  █████████████████████████████   *Id.*   This proof-of-concept

20  video was only shared internally at Eko as Google Drive documents that are

21  accessible only within the Eko organization.   *Id.*

22  ████████████████████████████████████████████████████

23  ███████████████████████████████████████████████████

24  ██████████.   Zubalsky Decl. ¶ 10.   Because the capabilities of the Internet and mobile

25  applications in 2012 were not compatible ██████████████████████

26  ██████████████   Eko did not attempt to develop a product incorporating this

27  method at that time.   *Id.*

28

### C.    Eko's Discussions with Snapchat, Inc.

In 2014, Eko Co-Founder and CEO Yoni Bloch was introduced to Evan Spiegel, the CEO of Snap.[6]  Bloch Decl. ¶ 11.  Mr. Spiegel in turn introduced Mr. Bloch to Clifton "CJ" Smith, who was then part of Snap's creative team.  *Id.*

In 2015, Eko began discussions with Snap—including Mr. Smith and Daniel Szeto—to discuss a creative collaboration between Snap and Eko  to develop original, short-form narrative content for Snap's platform.  Bloch Decl. ¶ 12; Zubalsky Decl. ¶ 12.  Eko's shows were originally produced and formatted for landscape view, but Snap's users mainly accessed Snap's content with mobile devices held in portrait orientation. Zubalsky Decl. ¶ 13.  Snap was interested in Eko providing a "vertical" version of Eko's content so that it could be viewed on Snap's platform. *Id.*

On or about December 9, 2015, Eko and Snap entered into a mutual NDA (the "Snap NDA") in order to facilitate further discussions.  Bloch Decl. ¶ 13 & Ex. 1; Zubalsky Decl. ¶ 13.  Only after executing the Snap NDA did Eko share any confidential proprietary technical information with Snap.  Bloch Decl. ¶ 13; Zubalsky Decl. ¶ 15 & Exs. 2, 3.  The Snap NDA provided that ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███." Bloch Decl., Ex. 1 § 2.  ████████████████████

████████████████████████████████████████████████

████████████████  *Id.* § 1.  The Snap NDA further provides that

████████████████████████████████████████████████

██████  *Id.* § 7.  And "████████████████████████████

████████," the NDA recognizes that

---

[6] Snapchat later changed its name to "Snap, Inc."

*Id.* § 12 (emphasis added).

Snap initially suggested it was interested in a vertical-only orientation format for distribution of Eko's content. Zubalsky Decl. ¶ 16. At the time, when a video originally formatted for horizontal display was viewed vertically, the video only would occupy a narrow band in the middle of the phone screen. *Id.*; Bloch Decl. ¶ 14. This would result in a poor user experience because the video is hard to view and much of the space of the phone screen is unused. *Id.* (both).

Eko believed Snap's solution to the problem—simply converting landscape videos to portrait orientation—was limited. Bloch Decl. ¶ 15; Zubalsky Decl. 16. Eko instead believed it could ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and decided that to develop a different and broader solution than what Snap had suggested. Bloch Decl. ¶ 15. Eko thus developed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* ¶ 17; Zubalsky Decl. ¶ 17. Eko's invention allows a user to view the same story from different perspectives when switching from portrait or landscape orientation, without wasting any screen space. *Id.* (both).

This led to the patent application for the patent that issued on October 29, 2019 as U.S. Patent No. 10,460,765 ("the '765 Patent"), entitled "Systems and Methods for Adaptive and Responsive Video."  Bloch Decl. ¶ 15; Zubalsky Decl. ¶¶ 7, 17 & Ex. 1.  The '765 Patent is directed to method and system for viewing a horizontally-filmed video so that it could be viewed in either portrait or landscape orientation, using substantially all of the screen viewing area in each, and allowing for seamless transitioning between the two orientations.  Bloch Decl. ¶ 9; Zubalsky Decl. ¶ 17. For example, Figure 2 of the '765 Patent shows how changing the orientation from landscape to portrait mode changes a user's perspective of the video:



On or around March 2017, Mr. Bloch told Mr. Smith that Eko had been inspired to create the invention claimed by the '765 Patent after being confronted by the problem Snap and Eko discussed—namely, how to distribute horizontally-filmed video on a mobile device that can be viewed in either portrait or landscape modes. Bloch Decl. ¶ 16.

But separately from the invention of the '765 Patent, Eko understood that it could combine its trade secret ████████████ first developed by Messrs. Benari and Zubalsky—the mobile device optimization RTS technology—with the method taught by the '765 Patent, ████████████████████████████████████ ████████████████████████████.  Bloch Decl. ¶ 17; Zubalsky Decl. ¶ 18. Eko has maintained this mobile device optimized RTS as a trade secret.   Zubalsky Decl. ¶ 11.  Indeed, the '765 Patent "████████████████████████████ ████████████████████████████████████."

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR PRELIMINARY INJUNCTION

S. Chatterjee Decl. ¶ 20 (emphasis in original); *see id.* ¶ 37.  Mr. Zubalsky and others disclosed this technology under an NDA to personnel at Snap, including Messrs. Szeto, Burfitt, and Smith.  Bloch Decl. ¶¶ 13, 17.

Eko also hosted creative workshops for Snap and Eko employees where Eko explained how to make the vertical videos for their platform.  Zubalsky Decl. ¶ 15.  In these workshops, Eko  explained its technology and the implementation.  *Id.*  One of the features Eko explained to Snap, including to Messrs. Smith and Szeto, was the RTS trade secret that Eko had initially developed and had since optimized for mobile phone use.  *Id.*

On or about October 16, 2017, Eko ███████████████████████████████ ████████████████████████████████████████████.  *Id.* ¶ 18.  Eko  discussed ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████.  *Id.*  A██████████████████████████████████ █████████████████████████████████████████████████████  *Id.* ¶¶ 18-19; Bloch Decl. ¶ 17.

Eko shared a link to ██████████████████ to Snap via email.  Zubalsky Decl. ¶¶ 19-20 & Ex. 4.  ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████.  *Id.* ¶ 20.  By viewing that file, Snap personnel could see, for instance, ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████.  *Id.*  The Snap personnel could also ██████████████████████████████████████████ ██████████████████████████████████  *Id.*

Snap did not follow up after Eko emailed ▮▮▮▮▮▮▮▮ on May 3, 2019, and discussions thereafter waned.  *Id.* ¶ 21.  On or around May or June 2018, the discussions between Eko and Snap ended.  Decl. of Ivy Sheibar ("Sheibar Decl.") ¶ 8.

On or about October 8, 2018, Mr. Smith notified Eko that he was leaving Snap to join Quibi.  Zubalsky Decl. ¶ 21 & Ex. 5.

### D.   Quibi Learns of Eko's Technology

On or about October 18, 2017, Mr. Katzenberg founded WCI One, LLC ("WCI").  *See* N. Chatterjee Decl. ¶ 3 & Ex. 2 (Articles of Incorporation).  On May 16, 2019, WCI filed a Certificate of Amendment with the Delaware Secretary of State, changing its name to Quibi Holdings, LLC.  N. Chatterjee Decl. ¶ 4 & Ex. 3.

On or about March 23, 2017—at the same time that Quibi was talking to Snap—Mr. Bloch met in Los Angeles with Jeffrey Katzenberg, co-founder of investment and holding company WndrCo Holdings LLC ("WndrCo"), to explore Mr. Katzenberg's interest in a potential investment in Eko.  Bloch Decl. ¶ 18.  Mr. Bloch generally described Eko's technology and company to Mr. Katzenberg  That same day, Mr. Bloch followed up by email and provided Mr. Katzenberg with other materials about the platform.  *Id.* ¶ 18 & Ex. 2.  Mr. Bloch's email provided a link to Eko experiences, including a demonstration of Eko's switching feature, a demo showing what Eko was doing in partnerships with MGM and Sony, Eko's authoring and development tools, and a New Yorker piece highlighting Eko's story and offerings.  *Id.* ¶ 18.  Mr. Katzenberg expressed interest in investing, but only if he could own a majority stake.  *Id.*

On February 27, 2019, Mr. Bloch, Jennifer Cron, Daniel Laikind, and Ivy Sheibar held a breakfast meeting in Los Angeles with Mr. Smith and Brian Tannenbaum of Quibi.  Bloch Decl. ¶ 20; Sheibar Decl. ¶ 9.  The purpose of this meeting was to develop relationships with people at Quibi for potential partnerships down the road.  Bloch Decl. ¶ 21.  At the meeting, Quibi represented to Eko that

Quibi intended to develop a mobile platform for a streaming service focused on short form ("quick bites").  *Id.*  Since a large focus of Eko's content development revolved around interactive storytelling, Eko inquired whether Quibi had any interest in hosting interactive storytelling on their platform.  *Id.*; Sheibar Decl. ¶ 10.  At that time, Quibi stated it had not yet developed its own platform.  Bloch Decl. ¶ 21.

Approximately one month later, Quibi employees—including Messrs. Smith and Burfitt—reached out to Eko, said they would be in New York, and asked for a meeting.  Bloch Decl. ¶ 22; Sheibar Decl. ¶ 11.  Messrs. Smith and Burfitt met with Mr. Bloch, Ms. Sheibar, and Daniel Laikind at Eko's offices in or around March 2019.  *Id.* (both).

During this meeting, Eko and Quibi continued their discussing a potential partnership, including on the possibility of Quibi's licensing of Eko's proprietary technology, both patented and trade secret, along with Eko's platform and creation tools.  Bloch Decl. ¶ 23; Sheibar Decl. ¶ 11.  But Messrs. Smith and Burfitt also showed Eko a demo of Quibi's application feature, where one show could be viewed in both horizontal and vertical perspectives—the feature that Quibi now refers to as "Turnstyle."  Bloch Decl. ¶ 23.  Messrs. Smith and Burfitt told Eko that Mr. Katzenberg used this nonoperable demo to "wow" investors to get them excited.  *Id.*  Although it is not possible could not tell from the simulation whether Quibi was using Eko's mobile device optimized RTS technology, Mr. Bloch immediately informed Smith and Burfitt during that meeting that the horizontal to vertical switching feature was Eko's proprietary technology, and they would need Eko's permission to use this technology.  *Id.*

Quibi and Eko then began discussing a partnership to deliver Eko's content on Quibi's forthcoming platform.  Bloch Decl. ¶ 24.  Messrs. Smith and Burfitt signed NDAs so that Eko and Quibi could continue these discussions.  Bloch Decl. ¶ 24 & Exs. 4, 5.  Both NDAs provide for injunctive relief in the event of a breach:

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR PRELIMINARY INJUNCTION

> acknowledge[] that *a breach of this Agreement would cause the Discloser irreparable harm which monetary damages will be insufficient to remedy*. Accordingly, the Discloser, , [*sic*] in addition to any other remedies available at law, shall be entitled to specific performance, *injunctive or other equitable relief* as a remedy for any such breach.

Bloch Decl., Exs. 4 & 5 § 3.9. (emphasis added).

Eko and Quibi continued their discussions through 2019.  Sheibar Decl. ¶ 12. Eko's final conversation with Quibi regarding a partnership was on January 7, 2020 – the day before the January 2020 CES – when Ms. Sheibar and Jocelyn Michels, another Eko employee, met Mr. Smith.  *Id.*  Eko expressed continued interest in a partnership with Quibi, and asked what Quibi intended to discuss during its keynote at CES.  *Id.*  None of Quibi's employees, however, said anything about what they intended to disclose at CES.  *Id.*

### E.  Quibi Steals Eko's Technology and Claims It as Its Own

Then, without any notice to or consent from Eko, Quibi introduced a new platform which it claimed to be its own at the January 2020 CES.  Bloch Decl. ¶ 25; Zubalsky Decl. ¶ 23.  Specifically, Quibi announced a feature it called "Turnstyle." *Id.* Quibi's CES keynote presentation showed that Turnstyle was strikingly similar to Eko's proprietary mobile device optimized RTS technology.

Not only did Quibi copy and debut Eko's mobile device optimized RTS, but Quibi also secretly sought to patent much of the technology that Eko had already patented and shared with Quibi.  At the same time that Messrs. Smith and Burfitt, on behalf of Quibi, reached out to meet with Eko in New York and discuss a potential partnership regarding the mobile device optimized RTS, Quibi unbeknownst to Eko began to seek patents related to the same technology.  On March 11, 2019, Quibi filed a provisional application; two months later, on May 17, 2019, Quibi filed a nonprovisional application, which resulted in the issuance of U.S. Patent No. 10,554,926 (the "'926 Patent") on February 4, 2020.   N. Chatterjee Decl. ¶ 5 & Ex.

4.  The '926 Patent is entitled "Media Content Presentation" and is directed to the same technology Eko had previously disclosed to Snapchat and Quibi under NDAs, and to both Messrs. Burfitt and Smith, who by now worked for Quibi. To Eko's great surprise, Burfitt and Smith both claimed that they, not Eko, were the inventors of the technology claimed in the '926 Patent and did not even disclose anything to the USPTO related to their knowledge of Eko's patents.

### F.   Quibi Causes Eko to Suffer Irreparable Harm

Eko has suffered irreparable harm as a result of Quibi's theft.  N. Chatterjee Decl., Ex. 8 (Decl. of Richard Eichmann ("Eichmann Decl.")) ¶ 25.  Quibi's January 2020 CES presentation has had a profoundly negative effect on Eko's reputation as a technology innovator.  Bloch Decl. ¶ 26; Sheibar Decl. ¶ 13.  The high degree of similarity between Quibi's advertised technology and Eko's own technology has created confusion in the industry with respect to Eko's reputation, causing an adverse impact to Eko with advertisers, distributors, and investors.  Bloch Decl. ¶ 26.

Prior to CES, Ms. Sheibar sold Eko's products and licenses by ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮.  Sheibar Decl. ¶ 13.  Since CES, Eko has seen confusion by distributors and partners saying they saw Quibi's offerings and asking if Eko is powering them.  *Id.*  Eko has also fielded questions and pushback from distributors on whether Eko is offering the same or similar features as Quibi is offering.  *Id.*  As a result, Eko has been forced to divert significant resources away from its efforts to promote Eko's technology leadership in order to rehabilitate Eko's reputation as a technology innovator and as a superior solution to Quibi.  *Id.* ¶ 14.

For instance,



*Id.* ¶ 15.

*Id.*



*Id.*

Eko had also

. *Id.* ¶ 16.

*Id.*

*Id.*

These harms are irreparable, ongoing, increasing, and unquantifiable.

### G.    Quibi Refuses to Honor its Confidentiality Obligations

Eko has repeatedly attempted to engage with Quibi to resolve this dispute. *See* Declaration of Neel Chatterjee ("N. Chatterjee Decl.") ¶¶ 2-6 & Exs. 5-7 (correspondence between Eko's and Quibi's counsel).  Following Quibi's January 2020 CES presentation, Eko and its counsel have made numerous requests that Quibi remind its employees hired by Snap to abide by the confidentiality obligations they agreed to while at Snap and Quibi, and for Quibi to cease and desist using Eko's technology. *Id.* ¶¶ 6-8 & Exs. 5, 7.  Quibi has refused to engage in any meaningful discussions, claiming that Messrs. Burfitt and Smith were not technologists at all while ignoring the fact that they are named inventors of the '926 Patent. *Id.* ¶ 9 & Ex. 6.  Rather than ceasing and desisting from its unlawful activity, on March 9, 2020, Quibi filed a declaratory judgment action in this Court, in a case styled *Quibi Holdings, LLC v. Interlude US, Inc. d/b/a Eko*, Case No. 2:20-cv-02250 (C.D. Cal.).

## III.   LEGAL STANDARD

A plaintiff seeking a preliminary injunction "must establish that [it] is likely to succeed on the merits [of its claims], that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Even if the plaintiff can only show that there are "serious

questions" as to the merits of its claims, a preliminary injunction should still issue if "the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

Courts in the Ninth Circuit take a "sliding scale" approach to these four factors, balancing them "so that a stronger showing of one element may offset a weaker showing of another." *Id.* at 1131. For example, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135 (internal quotation marks omitted). "While the basic function of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits, the status quo is not simply any situation before the filing of the lawsuit, but rather the last uncontested status that preceded the parties' controversy." *Dep't of Parks & Recreation for the State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) (*citing Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988)).

## IV.   <u>ARGUMENT</u>

Eko's Complaint asserts a claim against Quibi under the Defend Trade Secrets Act ("DTSA"), which provides for injunctive relief.[7] Dkt. No. 1 ¶¶ 51-61; 18 U.S.C. § 1836(b)(3)(B)(i) ("In a civil action brought . . . with respect to the misappropriation of a trade secret, a court may . . . grant an injunction . . . to prevent any actual or threatened misappropriation . . . on such terms as the court deems reasonable . . .").

A preliminary injunction should issue to prevent the irreparable harm from Quibi's imminent launch of its Turnstyle service incorporating Eko's proprietary technology. Once that happens, Quibi will seize market share and not only create a head-to-head competitor using Eko's technology, but will also cement consumer and market perception as the owner of technology that rightfully is Eko's. Such a

---

[7] Eko's second claim for patent infringement is not at issue in this motion.

preliminary injunction will preserve the existing status quo and allow Eko to maintain its intellectual property rights over its trade secrets.

### A.      Eko Is Likely to Succeed on the Merits of its Trade Secret Misappropriation Claim.

There is little doubt that Eko will prevail on the merits of its misappropriation claim. To succeed on its DTSA claim, Eko must prove "[its] ownership of the trade secret; [Quibi]'s misappropriation of the trade secret; and damage to [Eko] caused by the misappropriation." *Hill Phoenix, Inc. v. Classic Refrigeration Socal, Inc.*, No. 19-cv-00695-DOC-JDE, 2020 WL 1244354, at *3 (C.D. Cal. Mar. 15, 2020) (internal quotation marks and citation omitted).  That standard is easily met here.

### 1.      Eko's Mobile Device Optimized RTS Technology Constitutes a Trade Secret.

The mobile device optimized RTS technology is a trade secret.  The DTSA defines a "trade secret" as information that is subject to reasonable measures to keep secret, and derives independent economic value from not generally being known.

Eko has kept its mobile device optimized RTS technology confidential, including by limiting access to such information, storing the source code on password-protected servers, and requiring employees and third parties to sign NDAs and observe Eko's policy on protecting its proprietary and confidential information. Bloch Decl. ¶ 10.  Eko only disclosed this technology pursuant to non-disclosure obligations and even went so far as to remind Quibi that the information was Eko's proprietary technology when it was concerned that Quibi might be using Eko's technology without authorization.  *Id.* ¶¶ 13, 23; Zubalsky Decl. ¶ 15.

Eko's mobile device "'derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information" because ███████████████████████

███████████████████████████████████████████████████



.”  S. Chatterjee Decl. ¶ 29; Zubalsky Decl. ¶ 11

### 2. Quibi Misappropriated Eko's Trade Secrets.

Quibi misappropriated Eko's mobile device optimized RTS technology. "Misappropriation" occurs when "a person . . . knows or has reason to know that the trade secret was acquired by improper means" or when a person "disclos[es] or use[s] . . . a trade secret . . . without express or implied consent[.]" 18 U.S.C. § 1839(5)(A)-(B). "'[I]mproper means' . . . includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" but excludes "reverse engineering, independent derivation, or any other lawful means of acquisition[.]" 18 U.S.C. § 1839(6)(A)-(B).

California trade secret law has long recognized that a showing of access and similarity gives rise to an inference of copying. *Teich v. Gen. Mills, Inc.*, 170. Cal. App. 791, 797-98 (1959). In a trade secret case, "'disclosure of the secret to the defendant, followed by manufacture of a closely similar device by the defendant, shifts to the defendant the burden of going forward with evidence to prove, if it can, that it arrived at the process by independent invention.'" *Bal Seal Eng'g, Inc. v. Nelson Prods., Inc.*, Case No. 13-cv-01880-JLS-KESx, 2018 WL 4697255, at *7 (C.D. Cal. Aug. 3, 2018) (quoting *Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 793 (9th Cir. 1976))[8]; *Friedman v. Quest Int'l Fragrances Co.*, 58 F. App'x 359, 360 (9th Cir. 2003) (plaintiff's evidence that defendant met with her customers to

---

[8] Although *Bal Seal* concerned a claim brought under the California Uniform Trade Secret Act ("CUTSA"), it is nevertheless instructive, as the elements for a DTSA claim are similar to those under the CUTSA. *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018).

discuss plaintiff's proposals and employed "strikingly similar" ideas in its marketing of products was sufficient to defeat summary judgment of trade secret claim); *Chartwell Staffing Serv., Inc. v. Atl. Sols. Grp., Inc.*, Case No. 19-cv-00642-JLS-JDE, 2019 WL 2177262, at *9 (C.D. Cal. May 20, 2019).  The standard for determining similarity is "the common knowledge of the average reader, observer, spectator or listener." *Stanley v. Columbia Broadcasting Sys.*, 35 Cal. 2d 653, 662 (1950).

Quibi's Turnstyle technology is strikingly similar to Eko's mobile device optimized RTS technology, which gives rise to an inference of copying.  S. Chatterjee Decl. ¶ 42 ("Quibi's Turnstyle technology appears to use the same key features of Eko's trade secrets that were shared by Eko to certain members Quibi's technical team under non-disclosure agreements.").   Specifically, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Id.* ¶ 43.  Additionally, Eko's optimized RTS technology "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." *Id.*  These are the very technologies that Eko disclosed to Quibi—including Messrs. Smith and Burfitt—under the NDAs. *Id.* ¶ 44; Zubalsky Decl. ¶¶ 19-20.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) that Quibi is asserting are key features of its Turnstyle technology."  S. Chatterjee Decl. ¶ 44.

Quibi cannot show that it independently developed its Turnstyle technology.  In a trade secret case such as this one, "disclosure of the secret to the defendant, followed by manufacture of a closely similar device by the defendant, shifts to the defendant the burden of going forward with evidence to prove, if it can, that it arrived at the process by independent invention." *Droeger*, 541 F.2d at 793.  It is undisputable that Eko disclosed its mobile device optimized RTS technology to

Messrs. Burfitt and Smith pursuant to an NDA while they were employed at Snap.  It is also indisputable that Messrs. Burfitt and Smith then left Snap to join Quibi.  Nor can Quibi deny that Eko shared its mobile device optimized RTS technology to Quibi, again pursuant to multiple NDAs.  And Quibi's rapid development of its TurnStyle feature after these repeated confidential disclosures cannot credibly be explained as "independent development."  And it is a fact that Quibi then pursued a patent on behalf of Messrs. Burfitt and Smith, and did not even include Eko's technology as prior art.

### B.     Eko Is Suffering, and Will Continue to Suffer, Irreparable Harm.

A preliminary injunction should issue where the moving party has demonstrated that irreparable injury is likely in the absence of the preliminary injunction.  *Winter*, 555 U.S. at 22.  The NDAs that Eko entered into with Snap and Messrs. Smith and Burfitt acknowledge that ███████████████████████████████████████████████████████████████████████.  Bloch Decl., Ex. 1 § 12; *id.*, Exs. 4 & 5 § 3.9.  Indeed, as set forth in the Declaration of Richard Eichmann, Eko has suffered, and will continue to suffer, from the following types of harm.

### 1.     Quibi Has Caused Eko to Suffer Reputational Harm and a Loss of Goodwill.

As an award-winning, innovative media and technology company, Eko has "spent years cultivating valuable goodwill as part of its reputation as an innovator."  Eichmann Decl. ¶ 30.  "Being known as an innovator creates economic value, increases sales, increases profitability, and allows firms to charge a premium for their innovative products and services."  *Id.* ¶ 29. "This premium is known as a company's 'goodwill' and it represents an otherwise undefinable intangible asset."  *Id.*  But "company goodwill clearly has economic value and this value can be impaired through reputational harm."  *Id.*

There is already evidence that Eko has suffered from reputational harm and a loss of goodwill.  The high degree of similarity between Quibi's Turnstyle feature and Eko's own technology has created confusion in the industry with respect to Eko's reputation and has caused Eko's distributors and partners to ask if Eko is powering Quibi's offerings or if Eko is offering the same or similar features as Quibi.  Bloch Decl. ¶ 26; Sheibar Decl. ¶¶ 13-14.  Eko has been forced to expend significant resources away from its efforts to promote Eko's technology leadership in order to rehabilitate Eko's reputation as a technology innovator and as a superior solution to Quibi.  Sheibar Decl. ¶ 14.

Indeed, ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ Sheibar Decl. ¶¶ 15-16.

Quibi has unlawfully benefitted from Eko's reputation and goodwill to the Eko's detriment.  "[S]ome portion of the 'goodwill' generated by Eko's innovation has already been transferred to Quibi due to Quibi's CES announcement around its TurnStyle technology and subsequent advertising campaigns."  Eichmann Decl. ¶ 31.  Quibi has garnered substantial positive press surrounding the Turnstyle technology from media sources such as Engadget, The Verge, and Techcrunch.  *Id.*  In reality, this press is predicated on *Eko's* mobile device optimized RTS technology and should have been properly attributed to Eko.  *Id.* ¶ 32.  Instead of being seen as the undisputed creator of new original technology, Eko now must fight through the publicity Quibi has received and appear as the secondary competitor and later to the technology than Quibi.

### 2. Eko Is Likely to Suffer Intangible Harm

In addition to the foregoing damage, Quibi's misappropriation subjects Eko to harms that are real, yet difficult to quantify.  For instance, if Quibi were able to continue its allegedly unlawful product launch as scheduled, but then be subsequently forced to exit the market due to Eko's enforcement of its intellectual property rights,

this could cause confusion for customers, which Quibi could portray as Eko's fault, further damaging Eko's reputation.  *Id.* ¶ 35.  Eko's reputation could be further tarnished by Quibi's artificially accelerated entry into the marketplace [which] may also make Eko's technology and products appear less innovative. *Id.*  This tarnished reputation could also cause Eko to have "difficulty recruiting and keeping key employees, which causes further harm to Eko's current and future profitability." *Id.* ¶ 36.  In fact, ███████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████. *Id.*

### 3.   Eko Will Suffer from Price Erosion and Deteriorating Customer Relationships.

Quibi's actions on Eko's customer relationships are not measurable, even though such harm clearly exists.  *Id.* ¶ 41.  Innovators can charge a price premium for their research and development investment that led to the technology.  *Id.* ¶ 38. If customers are able to obtain the same technology from another company, they may not consider the technology as innovative and instead consider it as an easily-substituted commodity.  *Id.*

Eko's success in the commercial market is highly dependent on its established relationships with customers, who often provide Eko with proprietary and confidential information such as consumer activity data, pricing information, business and marketing plans, and strategies.  *Id.* ¶ 41.  Thus, the nature of Eko's work requires trust and mutual respect between each party, which can translate into customer loyalty.  *Id.*  Once Eko loses a customer (or has its reputation tarnished) due to it no longer being perceived as an innovator, the likelihood that a customer will switch back to Eko is influenced by this psychological switching cost, which cannot be adequately captured or controlled for a damages model.  *Id.*  This renders the impact of Quibi's actions on Eko's customer relationships immeasurable, even though such harm clearly exists.  *Id.*

### 4.     Harm to Access to Funding

Mr. Eichmann opines that Quibi's allegedly unlawful use of Eko's trade secrets will likely cause long-lasting economic harm to Eko through reduced access to funding and increased costs of capital.  *Id.* ¶ 46.  If Quibi continues its unlawful use of Eko's trade secrets, industry analysts and investors would likely reduce their expectations for Eko's future revenues and profits.  Eichmann Decl. ¶ 44.

There is also evidence that Quibi was able to raise a substantial amount of funding as of result of its theft.  On March 4, 2020, Quibi closed on $750 million in funding, which represents approximately 42.8% of their total funding raised to date ($1.75 billion).  *Id.* ¶ 45.  Roughly $350 million of this funding came after Quibi's CES keynote presentation.  *Id.*  In contrast, ███████████████████████████████████████████████████████████████████.  *Id.* ¶ 46.

Eko will not only have to compete against Quibi while Quibi gets to use Eko's technology, but  the two companies are also competing for the same venture capital funding to some extent.  *Id.* ¶ 45.  ████████████████████████████████████████████████████████████████████████████████████████.  *Id.* ¶ 48.

### C.     The Balance of Equities Weighs in Eko's Favor.

The balance of hardships also favors granting a preliminary injunction.  In deciding whether to issue a preliminary injunction, the court must consider the impact the injunction may have on each party.  A preliminary injunction should issue where the harm likely to be suffered by the plaintiff outweighs the likely harm to the defendant as a result of the injunction.  *Winter*, 555 U.S. at 24.  The balance of hardships tips in the moving party's favor where the harm the moving party would suffer absent the injunction would be permanent while the harm to the nonmoving party would be merely temporary.  *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014).

As discussed above, Eko has suffered, and will continue to suffer, irreparable harm if an injunction is not granted and Quibi is permitted to continue using Quibi's Turnstyle feature that was stolen from Eko.  Eichmann Decl. ¶¶ 27-57.  But Quibi does not face the same risk of injury, if any.  By stealing Eko's trade secrets, "Quibi has already gained already gained substantial reputational benefit and funding[.]"  *Id.* ¶ 59.  For instance, just this month, Quibi closed $750 million in funding.  *Id.*

Moreover, refraining from using Eko's mobile device optimized RTS technology would do no more than require Quibi and its former Snap employees comply with the NDA to which these employees agreed while employed at Snap, as well as require Quibi to comply with federal trade secret law.  *Dish Network L.L.C. v. Ramirez*, No. 15-CV-04712-BLF, 2016 WL 3092184, at *7 (N.D. Cal. June 2, 2016) (balance of equities favor an injunction where the "injunction would 'do no more than require Defendant to comply with federal and state . . . laws'").  Further, Quibi could still offer short videos through its network which were in portrait mode or landscape mode, but not videos that used the misappropriated technology.

### D.    A Preliminary Injunction Serves the Public Interest.

Where applicable, courts should consider the public consequences of issuing an injunction.  *Winter*, 555 U.S. at 24.  Courts have routinely found that that the public interest is served by protecting a company's right to proprietary information, business operations, and contractual rights.  *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 854 (N.D. Cal. 2019) ("Courts often find that the public has a strong interest in protecting intellectual property rights."); *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017) ("the public has an interest in vindicating [trade secret] rights").  Indeed, Quibi has no legitimate right to use Eko's trade secrets.

There is also a strong public interest to ensure that the former Snap employees—including but not limited to Messrs. Smith, Burfitt, and Szeto—abide by their contractual obligations under the Snap NDA with Eko.

### E.     Only a Minimum Bond Should be Required.

A minimum bond is appropriate here.  Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  "The district court retains discretion as to the amount of security required, *if any*."  *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (emphasis in the original; internal quotation marks and citation omitted).

As explained above, there is a strong likelihood that Eko will prevail on the merits of its DTSA claim.  It unlikely that Quibi will be able to produce evidence that it did not steal Eko's trade secrets after the technology had been disclosed to Messrs. Smith and Burfitt while they were employees at Snap and to Mr. Katzenberg. Moreover, Quibi will suffer minimal damage if the requested relief is granted because it can still offer a service, just not a service using the misappropriated technology.

## V.     **CONCLUSION**

For the foregoing reasons, Eko respectfully requests that the Court grant Eko's Motion for Preliminary Injunction and enjoin Quibi from using Eko's trade secret information and from selling, offering for sale, marketing, or using the Turnstyle feature.

Dated:  April 1, 2020

Respectfully submitted,

GOODWIN PROCTER LLP


By:  _/s/ I. Neel Chatterjee_
I. Neel Chatterjee

Attorneys for Plaintiff
JBF Interlude 2009 Ltd. – Israel

OF COUNSEL:

GOODWIN PROCTER LLP

1  Cindy Chang (*pro hac vice*)
2  620 8th Avenue
   New York, New York 10018
3  Telephone:  (212) 813-8800
4  Facsimile:  (212) 355-3333
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR PRELIMINARY INJUNCTION